UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

ALPHONSO WHIPPER,
    *Plaintiff*,

v.

SCOTT ERFE, *et al.*,
    *Defendants*.

No. 3:18-cv-00347 (JAM)

**INITIAL REVIEW ORDER PURSUANT TO 28 U.S.C. § 1915A**

Plaintiff Alphonso Whipper is a prisoner in the custody of the Connecticut Department of Correction. He has filed a complaint *pro se* and *in forma pauperis* under 42 U.S.C. § 1983 against Warden Scott Erfe, District Administrator Angel Quiros, Deputy Warden Amanda Hannah,[1] Grievance Coordinator Selena Rious, Captain James Watson, and Intelligence Officers Anna Verdura and James Wright. After an initial review, I conclude that the complaint should be dismissed as to defendants Erfe, Hannah, Quiros, and Rious but proceed against defendants Verdura, Wright, and Watson on plaintiff's claim of unlawful retaliation in violation of his constitutional right to maintain his innocence of a disciplinary charge.

**BACKGROUND**

The following facts are alleged in the complaint and are accepted as true only for purposes of this initial ruling. On November 21, 2016, plaintiff was summoned to the lieutenants' office and informed by Lieutenant Correia of allegations that he was involved in a physical altercation with another inmate, Edwin Snelgrove. Plaintiff was also informed that as the result of the allegations he was being placed in restrictive housing. Plaintiff denied that he had been involved in such an altercation. Doc. #1 at 3–4 (¶¶ 12–16).

---

[1] Defendant misspells this defendant's name in the complaint.

1

Officer Wright, who had escorted plaintiff to the office, began recording the meeting with a camera. Wright instructed plaintiff to remove his shirt, and plaintiff complied. Plaintiff again denied being involved in the fight. Officer Wright requested that plaintiff turn his right shoulder toward the camera, and plaintiff stated that he believed Wright was fabricating evidence. Wright replied, "I know you were in a fight last week you're not going to get away with it." Plaintiff indicated that he had played basketball twice in the previous week and that any marks on his body likely resulted from his athletic activities. Lieutenant Correia proceeded to place plaintiff in a restrictive housing unit. *Id.* at 4 (¶¶ 17-21)

Later that day, medical personnel evaluated plaintiff and did not note any injuries on his body. During the examination, neither Lieutenant Correia nor Officer Wright informed the medical personnel of any perceived injuries to plaintiff. *Ibid.* (¶ 22).

Plaintiff was asked to write a statement about the alleged physical altercation. Plaintiff complied and wrote that he had no knowledge of the incident. To plaintiff's knowledge, both he and Snelgrove were placed in restrictive housing on administrative detention status pending the investigation. *Ibid.* (¶¶ 23–24).

On November 22, 2016, plaintiff met with disciplinary report investigator Officer Cossette. Officers Verdura and Perrachio were also present at the meeting. Officer Cossette expressed surprise that plaintiff wanted to meet with him. When Officer Cossette inquired about the altercation with Snelgrove, plaintiff again denied any involvement. Officer Cossette stated that both plaintiff and Snelgrove sustained eye injuries. Plaintiff countered that his eyes always appear the way they were shown in the photographs, and he requested that Officer Cossette retrieve his ID photo, which he believed would confirm his claim about the ordinary appearance of his eyes. *Id.* at 5 (¶¶ 26-29).

Officer Verdura told plaintiff that she knew about the fight and that Warden Erfe was upset that no officer had reported the fight. Plaintiff stated that there were no reports because the fight had never occurred. Officer Perrachio stated that regardless of whether there had in fact been a fight, plaintiff would remain in administrative detention for 15 days. Officer Verdura then showed plaintiff a picture of Snelgrove's alleged eye injury, which plaintiff believes was inconsistent with a punch to the eye area. *Id.* at 5-6 (¶¶ 30–33)

On November 28, 2016, plaintiff received a disciplinary report from Verdura for fighting. The report contained inaccurate information, including: (1) a statement that the investigation commenced on November 16, 2017, and (2) a photo that allegedly depicts plaintiff's eye injury but in fact depicts his typical appearance. Snelgrove also received a disciplinary report for fighting, and both inmates pleaded not guilty. *Id.* at 6 (¶¶ 34–36).

On December 5, 2016, plaintiff received a summary report dismissing the disciplinary report for a "lack of evidence." Snelgrove received the same dismissal notification. Despite the dismissal, neither inmate was released from their restrictive housing cells. *Ibid.* (¶¶ 37–38).

On December 6, 2016, Captain Watson asked plaintiff to submit a written statement expressing that he and Snelgrove were not a threat to one another, and plaintiff complied. That same day, Snelgrove was released back into general population, but plaintiff was kept in restrictive housing pending an investigation into his "submitted profile request." *Id*. at 6–7 (¶¶ 37–40).

Plaintiff complained to Watson that it was unfair to release Snelgrove back into the general population while keeping him in restrictive housing. Watson explained that plaintiff had to remain in segregated housing due to the premature submission of a "profile request" that was based on the assumption that both prisoners were going to plead guilty. To correct this error, a

3

new profile request had to be submitted while plaintiff remained in restrictive housing. Plaintiff explained that he would lose a semester of the college program he was enrolled in to which Watson replied, "Next time, keep your hands to yourself." *Id.* at 6–7 (¶¶ 40-43).

While in restrictive housing, plaintiff submitted multiple written requests to various senior officials at Cheshire Correctional, including Warden Erfe, Deputy Warden Hannah, and Grievance Coordinator Rious. He also informed Watson that he intended to pursue litigation if his placement issue was not resolved. *Id.* at 7 (¶ 44).

On December 12, 2016, plaintiff asked Watson why he was still being held in restrictive housing, and Watson responded that "his paperwork had been lost in the shuffle." On the same day, plaintiff filed his first grievance regarding his prolonged confinement in restrictive housing. During the week of December 19, 2016, plaintiff against asked Watson why he had not been released back into general population. Watson told plaintiff, "I'm surprised that you're handling this so well, but you're still not getting out of here just because you've been down here so long." Watson further stated that he had been e-mailing the classification officer regarding the matter but had not yet received a response. *Id.* at 7–8 (¶¶ 45-48).

During that same week, plaintiff also asked Deputy Warden Hannah why she had been ignoring his situation. Hannah replied, "Until you submit something to me directly, I cannot get involved." Plaintiff then informed Hannah of his intent to pursue litigation. On December 23, 2016, plaintiff, wrote a five-page letter to Hannah. *Id.* at 8 (¶¶ 49–50).

On December 30, 2016, plaintiff was finally released to the general population after having spent 39 days in restrictive housing. Plaintiff alleges that this prolonged placement in housing was retaliation for his decision to plead not guilty to the disciplinary report. He claims

4

that the Cheshire Correctional administration intended to deprive him of his job, privileges, and time in his college program. *Ibid.* (¶¶ 51–52).

On January 10, 2017, plaintiff filed a second grievance for his confinement in restrictive housing and alleged that it was based on retaliation. On January 26, 2017, plaintiff was called to Coordinator Rious's office. Rious stated that the grievance was duplicative, but plaintiff explained that the second grievance was intended to amend the first because he came to believe that the improper continued placement was an act of retaliation. Rious nonetheless rejected plaintiff's second grievance as duplicative. Rious then offered plaintiff a new job working as a garbage man. Plaintiff initially rejected the offer because he did not want it to appear that he was negotiating with Rious. But after learning that refusing a job offer could result in another disciplinary report, plaintiff accepted the job, even though it paid four times less than his previous job. *Id.* at 8–9 (¶¶ 53–61)

On February 3, 2017, plaintiff received from Rious a notice of extension regarding his initial grievance. That same day, plaintiff also filed a level two grievance regarding his initial grievance. On February 6, 2017, plaintiff informed Rious of his level two grievance. On February 7, 2017, plaintiff was provided with the following paperwork: his initial grievance which was "expired" and then "reactivated" and included both a "decision of compromise" and a "decision of denial," his second grievance that was rejected as repetitive, and his unfiled level two grievance. This paperwork was dated February 6, 2017, which was the same day that plaintiff informed Rious of his level two grievance. *Id.* at 9–10 (¶¶ 62–65).

On February 9, 2017, plaintiff appealed Rious's rejection of his second grievance as duplicative. This appeal was denied by District Administrator Quiros in March. *Id.* at 10 (¶¶ 66, 68).

On February 17, 2017, plaintiff filed a grievance against Rious and Erfe. On March 20, Erfe denied the grievance against Rious on the ground that the Rious grievance requested a resolution that was identical to his proposed resolution in a previous grievance, but did not specify to which earlier grievance this referred. On March 21, 2017, plaintiff appealed the denial of the grievance against Rious. Quiros denied the appeal in May 2017. *Id.* at 10 (¶¶ 67, 69–71).

**DISCUSSION**

Pursuant to 28 U.S.C. § 1915A, the Court must review a prisoner's civil complaint against a governmental entity or governmental actors and "identify cognizable claims or dismiss the complaint, or any portion of the complaint, if the complaint—(1) is frivolous, malicious, or fails to state a claim upon which relief may be granted; or (2) seeks monetary relief from a defendant who is immune from such relief." If the prisoner is proceeding *pro se*, the allegations of the complaint must be read liberally to raise the strongest arguments that they suggest. *See Tracy v. Freshwater*, 623 F.3d 90, 101–02 (2d Cir. 2010).

In recent years, the Supreme Court has set forth a threshold "plausibility" pleading standard for courts to evaluate the adequacy of allegations in federal court complaints. A complaint must allege enough facts—as distinct from legal conclusions—that give rise to plausible grounds for relief. *See, e.g.*, *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). Notwithstanding the rule of liberal interpretation of a *pro se* complaint, a *pro se* complaint may not survive dismissal if its factual allegations do not meet the basic plausibility standard. *See, e.g.*, *Fowlkes v. Ironworkers Local 40*, 790 F.3d 378, 387 (2d Cir. 2015).

Plaintiff has brought his claims against several of the defendants in both their individual and official capacities. To the extent that plaintiff intended to bring official-capacity claims

6

against any of the defendants for money damages, such claims are plainly barred by the Eleventh Amendment because each of the defendants is an employee of the State of Connecticut *See, e.g.*, *Kentucky v. Graham*, 473 U.S. 159, 169 (1985). In addition, because plaintiff has been released from restrictive housing and there are no allegations of any ongoing constitutional violations, his request for injunctive relief is moot. All that remains for me to consider are his claims against defendants in their individual capacities for money damages.

### *Supervisory and Grievance Liability*

Plaintiff's claims against Warden Erfe, Deputy Warden Hannah, District Administrator Angel Quiros, and Grievance Coordinator Rious rest on their failure to respond to his complaints and grievances. But plaintiff has failed to allege sufficient facts to show that Erfe, Hannah, Quiros, or Rious were personally involved in any deprivation of his constitutional rights—that they investigated or ordered him to be confined in restrictive housing or that they engaged in any other conduct amounting to retaliation for plaintiff's insistence that he was innocent of the fighting charge. *See Raspardo v. Carlone*, 770 F.3d 97, 116 (2d Cir. 2014) (noting that "liability for supervisory government officials cannot be premised on a theory of *respondeat superior* because § 1983 requires individual, personalized liability on the part of each government defendant."). As to a claimed wrong that has been the subject of a later grievance, "a supervisory official's act of affirming the denial of a grievance on appeal does not constitute personal involvement." *Young v. Choinski*, 15 F. Supp. 3d 172, 191 (D. Conn. 2014). Similarly, a "failure to respond to a letter of complaint does not constitute the personal involvement necessary to maintain a section 1983 claim." *Richardson v. Dep't of Corr.*, 2011 WL 710617, at *3 (S.D.N.Y. 2011). Accordingly, I will dismiss all claims against Erfe, Hannah, Quiros, and Rious.

*Retaliation*

Plaintiff alleges that the three remaining correctional officer defendants—Verdura, Wright, and Watson—caused and prolonged his stay in restrictive housing because he was not willing to admit to fighting with Snelgrove. Whether plaintiff's insistence on his innocence is viewed as protected speech under the First Amendment or as an exercise of the right against self-incrimination under the Fifth Amendment, plaintiff had a constitutional right not to be consigned to administrative segregation simply for declining to admit guilt to a disciplinary charge for fighting. *See Baxter v. Palmigiano*, 425 U.S. 308, 316 (1976) (inmate has right not to self-incriminate during prison disciplinary hearings if evidence might incriminate them in later criminal proceedings); *Ransom v. Herrera*, 2017 WL 2833396, at *7 (E.D. Cal.), *report and recommendation adopted*, 2017 WL 3282855 (E.D. Cal. 2017).

The basic requirements for a constitutional retaliation claim are that a plaintiff engaged in speech or other conduct protected under the Constitution and that the defendant in turn took adverse action against the plaintiff because of the constitutionally protected speech or activity. *See Dolan v. Connolly*, 794 F.3d 290, 294 (2d Cir. 2015). Although not all unfavorable acts that a correctional officer defendant may take against a prisoner plaintiff are significant enough to be cognizable for purposes of a retaliation claim, *see Davis v. Goord*, 320 F.3d 346, 353 (2d Cir. 2003), there can be little doubt that maintaining a prisoner in weeks of lockdown status for retaliatory reasons would be sufficiently adverse for purposes of a constitutional retaliation claim. *See, e.g.*, *Manon v. Hall*, 2015 WL 8081945, at *8 (D. Conn. 2015).

Here I conclude that plaintiff has alleged enough facts for initial pleading purposes to allow his retaliation claim against Verdura, Wright, and Watson to proceed. Plaintiff has alleged

facts suggesting that his claims of innocence were repeatedly rejected and that his detention in restrictive housing persisted for weeks after he was formally cleared of the allegation of fighting and after he complained about his continued restriction. All three of these defendants were personally involved in the investigation or continued detention of plaintiff in restrictive housing. Although discovery may well disclose that one or more of the remaining defendants had nothing to do with the restrictive housing designation or that plaintiff's restrictive housing assignment had nothing to do with any desire to penalize him for declining to admit his guilt, I conclude at this very preliminary stage that the complaint adequately alleges enough facts to give rise to a plausible claim of retaliation by defendants Verdura, Wright, and Watson on account of plaintiff's exercise of a constitutional right. This ruling is without prejudice to the right of any of the named defendants to file a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6).

**ORDERS**

(1) All claims against Hannah, Rious, Erfe, and Quiros are dismissed. Plaintiff's request for injunctive relief is dismissed. Plaintiff's claims for retaliation may proceed against Watson, Verdura, and Wright in their individual capacity for money damages.

(2) The Clerk shall verify the current work addresses for Watson, Verdura, and Wright with the DOC Office of Legal Affairs, mail a waiver of service of process request packet containing the complaint to the defendant at the confirmed address within **twenty-one (21) days** of this Order, and report to the Court on the status of the waiver request on the **thirty-fifth (35) day after mailing**. If the defendant fails to return the waiver request, the clerk shall make arrangements for in-person service by the U.S. Marshals Service on him or her, and the defendant shall be required to pay the costs of such service in accordance with Fed. R. Civ. P. 4(d).

9

(3) The defendants shall file their response to the complaint, either an answer or motion to dismiss, within **sixty (60) days** from the date the notice of lawsuit and waiver of service of summons forms are mailed to them. If the defendant chooses to file an answer, he shall admit or deny the allegations and respond to the cognizable claims recited above. He may also include any and all additional defenses permitted by the Federal Rules.

(4) Discovery, pursuant to Fed. R. Civ. P. 26-37, shall be completed within **six months (180 days)** from the date of this order. Discovery requests need not be filed with the court.

(5) All motions for summary judgment shall be filed within **seven months (210 days)** from the date of this order.

It is so ordered.

Dated at New Haven, Connecticut this 25th day of May 2018.

    /s/*Jeffrey Alker Meyer*
Jeffrey Alker Meyer
United States District Judge