# UNITED STATES DISTRICT COURT
# DISTRICT OF CONNECTICUT

| | |
|---|---|
| ALPHONSO WHIPPER,<br>    *Plaintiff*,<br><br>v.<br><br>SCOTT ERFE, *et al.*,<br>    *Defendants*. | No. 3:18-cv-00347 (JAM) |

**INITIAL REVIEW OF AMENDED COMPLAINT PURSUANT TO 28 U.S.C. § 1915A**

    Plaintiff Alphonso Whipper is a prisoner in the custody of the Connecticut Department of Correction at Cheshire Correctional Institution. Proceeding *pro se* and *in forma pauperis*, on February 27, 2018, he filed a civil complaint under 42 U.S.C. § 1983 against seven prison officials: Warden Scott Erfe, District Administrator Angel Quiros, Deputy Warden Amanda Hannah, Captain James Watson, Administrative Remedies Coordinator Selena Rious, and Officers Anna Verdura and James Wright. Whipper claimed that the defendants unconstitutionally retaliated against him for pleading not guilty to a disciplinary charge by placing him in administrative segregation. After an initial review, I dismissed the claims against defendants Erfe, Hannah, Quiros, and Rious but permitted the retaliation claim to proceed against Verdura, Wright, and Watson. Doc. #9 at 7–9; *see Whipper v. Erfe*, 2018 WL 2390142, at *5 (D. Conn. 2018).

    Whipper moved for leave to file an amended complaint to cure the initial complaint's factual defects, Doc. #13, and I granted the motion, Doc. #14. I ordered him to file an amended complaint incorporating all the changes described in his motion. Doc. #15. Whipper has now filed an amended complaint, Doc. #16, which I will review pursuant to 28 U.S.C. § 1915A.

1

## BACKGROUND

The following facts are alleged in the amended complaint and are accepted as true only for purposes of this ruling. On November 21, 2016, Whipper was summoned to the lieutenants' office and informed by Lieutenant Correia of allegations that he was involved in a physical altercation with another inmate, Edwin Snelgrove. Doc. #16 at 3–4 (¶¶ 12–15). He was also informed that, as a result of the allegations, he was being placed in restrictive housing. *Id.* at 3 (¶ 14). Whipper denied that he had been involved in such an altercation. *Id.* at 4 (¶ 16).

Officer Wright, who had escorted Whipper to the office, instructed Whipper to remove his shirt for photos, and he complied and again denied being involved in the fight. *Id.* at 3–4 (¶¶ 13, 17–20). Wright requested that Whipper turn his right shoulder toward the camera, and Whipper stated that he believed Wright was fabricating evidence. *Id.* at 4 (¶ 18). Wright replied, "I know you were in a fight last week [and] you're not getting away with it." *Ibid.* (¶ 19). Whipper indicated that he had played basketball twice in the previous week and that any marks on his body likely resulted from his athletic activities. *Ibid.* (¶ 20). Lieutenant Correia proceeded to place Whipper in a restrictive housing unit. *Ibid.* (¶ 21).

Whipper was asked to write a statement about the alleged physical altercation. *Ibid.* (¶ 23). He complied and wrote that he had no knowledge of the incident. To Whipper's knowledge, both he and Snelgrove were placed in restrictive housing on administrative detention status pending the investigation. *Id.* at 4–5 (¶ 24).

On November 22, 2016, Whipper met with disciplinary report investigator Officer Cossette. *See id.* at 5 (¶ 25). Officers Verdura and Perrachio were also present at the meeting. *Ibid.* (¶ 26). Cossette expressed surprise that Whipper wanted to meet with him. *Ibid.* (¶ 27).

When Cossette inquired about the altercation with Snelgrove, Whipper again denied any involvement. *Ibid.* Cossette stated that both Whipper and Snelgrove sustained eye injuries. *Ibid.* (¶ 28). Whipper countered that his eyes always appear the way they were shown in the photographs, and he requested that Cossette retrieve his ID photo, which he believed would confirm his claim about the ordinary appearance of his eyes. *Ibid.* (¶29).

Verdura told Whipper that they knew about the fight and that Warden Erfe was upset that no officer had reported the fight or Snelgrove's injuries. *Ibid.* (¶¶ 30–31). Whipper stated that there were no reports because the fight had never occurred, and that it was unusual for wardens to investigate allegations of fights. *Ibid.* Whipper then informed Verdura that he and Erfe had a "tense relationship based on past grievances and complaints made by [him] against unfair and harsh restrictions . . . implemented by . . . Erfe spanning two prisons." *Id.* at 5–6 (¶ 32). Peracchio stated that regardless of whether there had in fact been a fight, Whipper would remain in administrative detention for 15 days. *Id.* at 6 (¶ 33). Verdura then showed Whipper a picture of Snelgrove's alleged eye injury, which Whipper believes was inconsistent with a punch to the eye area. *Id.* at 5–6 (¶¶ 30–34).

On November 28, 2016, Whipper received a disciplinary report from Verdura for fighting. *Id.* at 6 (¶ 35). The report contained inaccurate information, including: (1) a statement that the investigation commenced on November 16, 2016, and (2) a photo that allegedly depicts Whipper's eye injury but in fact depicts his typical appearance. *Ibid.* (¶ 36). Snelgrove also received a disciplinary report for fighting, and both inmates pleaded not guilty. *Ibid.* (¶ 37).

On December 5, 2016, Whipper received a summary report dismissing the disciplinary report for a "lack of evidence." *Ibid.* (¶ 38). Snelgrove received the same dismissal notification.

3

Despite the dismissal, neither inmate was released from his restrictive housing cell. *Ibid.* (¶¶ 38–39).

On December 6, 2016, Captain Watson summoned Whipper to his office. *Id.* at 6–7 (¶ 40). When Whipper arrived, Watson told him that Erfe wanted Whipper to sign a waiver in order to be sent to Alaska. *Ibid.* Upon seeing Whipper's reaction, he asked that Whipper and Snelgrove submit written statements in accordance with protocol expressing that they were not a threat to one another, and Whipper complied. *Ibid.* at 7 (¶ 40). After completing his statement, Snelgrove was released back into the general population, but Whipper was kept in restrictive housing and given a new administrative detention status because a profile request had been submitted and was "pending investigation." *Ibid.* (¶ 41). Whipper could not find any prison policy establishing or permitting the use of this status. *Ibid.*

Whipper complained to Watson that it was unfair to release Snelgrove back into the general population while keeping him in restrictive housing. *Ibid.* (¶ 42). Watson explained that Whipper had to remain in segregated housing due to the premature submission of the "profile request" that was based on the assumption that both prisoners were going to plead guilty. *Ibid.* (¶ 43). To correct this error, a new profile request had to be submitted while Whipper remained in restrictive housing. *Ibid.* Whipper explained to Watson that he would lose a semester of the college program in which he was enrolled, but Watson dismissed his complaint, stating, "Next time, keep your hands to yourself." *Ibid.* (¶ 44).

While in restrictive housing, Whipper submitted multiple written requests to various senior officials at Cheshire, including Erfe, Deputy Warden Hannah, and Grievance Coordinator

4

Rious. *Ibid.* (¶ 45). He also informed Watson that he intended to pursue litigation if his placement issue was not resolved. *Ibid.*

On December 12, 2016, Whipper asked Watson why he was still being held in restrictive housing, and Watson responded that "his paperwork had been lost in the shuffle." *Id.* at 7–8 (¶ 46). That same day, Whipper submitted a grievance form for "staff misconduct." *Id.* at 8 (¶ 47).

During the week of December 19, 2016, Whipper again asked Watson why he had not been released back into general population. *Ibid.* (¶ 48). Watson told Whipper, "I'm surprised that you're handling this so well, but you're still not getting out of here just because you've been down here so long." *Ibid.* Watson further stated that he had been e-mailing the classification officer regarding the matter but had not yet received a response. *Ibid.* (¶ 49). That same week, Whipper asked Hannah why she had been ignoring his situation. *Ibid.* (¶ 50). Hannah replied, "Until you submit something to me directly, I cannot get involved." *Ibid.* She told Whipper that face-to-face interactions and written requests would not suffice, and that Whipper had to write her a personal letter, specifying the details. *Ibid.* Whipper complied but informed Hannah of his intention to litigate what he believed to be an arbitrary application of the Department of Correction's Administrative Directives. *Ibid.* On December 23, he wrote a five-page personal letter to Hannah. *Ibid.* (¶ 51).

On December 30, 2016, Whipper was released to the general population after having spent 39 days in restrictive housing. *Ibid.* (¶ 52). Whipper alleges that this prolonged placement in housing was retaliation for his decision to plead not guilty to the disciplinary report. *Id.* at 8–9 (¶ 53). He further "believes" that, based on his past history with Erfe and Erfe's unusual

5

investigatory role, it was Erfe who directed the retaliatory actions. *Ibid.* Whipper lost his job, college credit, and freedom of movement. *Ibid.*

Once released from restrictive housing, Whipper learned that "Hannah and Erfe had determined to continue retaliating against [him] through further deprivations, with no intentions of reconciling the deprivations already suffered." *Id.* at 9 (¶ 54). On January 5, 2017, Hannah admitted to Whipper that it was, in fact, the intention of the administration to continue punishing him because they believed he was guilty of fighting Snelgrove but they could not prove it. *Ibid.* (¶ 55). When Whipper told Hannah that doing so would violate due process, Hannah responded, "You're lucky we let you out of seg." *Ibid.*

On January 10, 2017, Whipper filed a second grievance for "staff misconduct" because all of the information he had discovered revealed an ongoing conspiracy to retaliate against him. *Ibid.* (¶ 56). Whipper also requested reinstatement of his job. *Ibid.* Over the next several weeks, he met with Rious to address his complaints. *Id.* at 9–10 (¶ 57).

On January 26, 2017, Whipper was called to Rious's office. *Id.* at 10 (¶ 59). Rious stated that the second grievance was duplicative, but Whipper explained that the second grievance was intended to amend the first because he came to believe that the improper continued placement was an act of retaliation. *Ibid.* (¶ 60). Rious nonetheless rejected the second grievance and stated that the administration would not be allowing him to return to his job. *Ibid.* (¶ 63). She offered Whipper a new job working as a garbage man, but Whipper rejected the offer because he did not want it to appear that he was compromising with Rious. *Ibid.* Then after learning that refusing a job offer could result in another disciplinary report, Whipper accepted the job, even though it paid a quarter of what his previous job did. *Id.* at 11 (¶¶ 65–66).

On February 1, 2017, Whipper's initial grievance expired, and two days later, he received a "post-expired notice for extension" from Rious. *Ibid.* (¶¶ 67–68). Whipper rejected the extension and instead filed a second level appeal from his second grievance, which had been rejected as duplicative. *Ibid.* (¶¶ 68–70). Then, the initial grievance from December 2016 was "reactivated" and ruled a "compromise," which Whipper alleges shows a "fabricated narrative." *Ibid.* (¶ 70). He alleges that Rious was retaliating against him for refusing to plead guilty to the disciplinary report and exercising his right to appeal her decision. *Ibid.* (¶ 71). Whipper also learned that Erfe had directed administrative officials to mark his grievances as exhausted in order to prevent him from showing that the decisions were improper. *Id.* at 12 (¶ 72).

On February 17, 2017, Whipper filed a third grievance against Rious for retaliation based on her rejection of the second grievance as duplicative. *Ibid.* (¶ 74). He argued that Rious' retaliatory action "somehow legitimized the 'reactivation' of [his] expired grievance, which further implicated the fabricated narrative that plaintiff [had] compromise[d]." *Ibid.*

In March 2017, Whipper received a decision from District Administrator Quiros denying his appeal from the second grievance. *Ibid.* (¶ 75). Quiros wrote that Whipper was "confused" by the grievance being ruled a "compromise" but explained as a "denial." *Ibid.* On March 20, Whipper received from Erfe a decision on his grievance against Rious. *Id.* at 13 (¶ 77). Erfe agreed that the two prior grievances were repetitive because both contained the same proposed resolution: reinstatement of Whipper's employment. *Ibid.* The next day, Whipper appealed Erfe's decision. *Ibid.* (¶ 78). Quiros rejected that appeal in May 2017 for the same reasons as the first appeal. *Ibid.* (¶ 79). In doing so, Quiros labeled Whipper as a "threat to safety and security." *Ibid.*

**DISCUSSION**

Pursuant to 28 U.S.C. § 1915A, the Court must review a prisoner's civil complaint against a governmental entity or governmental actors and "identify cognizable claims or dismiss the complaint, or any portion of the complaint, if the complaint—(1) is frivolous, malicious, or fails to state a claim upon which relief may be granted; or (2) seeks monetary relief from a defendant who is immune from such relief." If the prisoner is proceeding *pro se*, the allegations of the complaint must be read liberally to raise the strongest arguments that they suggest. *See Tracy v. Freshwater*, 623 F.3d 90, 101–02 (2d Cir. 2010).

In recent years, the Supreme Court has set forth a threshold "plausibility" pleading standard for courts to evaluate the adequacy of allegations in federal court complaints. A complaint must allege enough facts—as distinct from legal conclusions—that give rise to plausible grounds for relief. *See, e.g.*, *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). Notwithstanding the rule of liberal interpretation of a *pro se* complaint, a *pro se* complaint may not survive dismissal if its factual allegations do not meet the basic plausibility standard. *See, e.g.*, *Fowlkes v. Ironworkers Local 40*, 790 F.3d 378, 387 (2d Cir. 2015).

*Retaliation*

I have already permitted Whipper's retaliation claim to proceed against Verdura, Wright, and Watson based on the allegations that they prolonged his placement in restrictive housing for his refusal to plead guilty to fighting with Snelgrove. Doc. #9 at 8. An issue remains as to whether Whipper has stated sufficient factual allegations to support a retaliation claim against Erfe, Hannah, Rious, and Quiros.

The basic requirements for a constitutional retaliation claim are that a plaintiff engaged in speech or other conduct protected under the Constitution and that the defendant in turn took adverse action against the plaintiff because of the constitutionally protected speech or activity. *See Dolan v. Connolly*, 794 F.3d 290, 294 (2d Cir. 2015). Courts treat prisoner retaliation claims "with skepticism and particular care, because virtually any adverse action taken against a prisoner by a prison official—even those otherwise not rising to the level of a constitutional violation—can be characterized as a constitutionally proscribed retaliatory act." *Dorsey v. Fisher*, 468 F. App'x 25, 27 (2d Cir. 2012) (citation omitted).

As I concluded in my previous order, Whipper had a right not to be consigned to administrative segregation simply for declining to admit guilt to a disciplinary charge to fighting. *See* Doc. #9 at 8 (citing *Baxter v. Palmigiano*, 425 U.S. 308, 316 (1976)). And while not every adverse action that a correctional officer takes against a prisoner is constitutionally cognizable, *see Davis v. Goord*, 320 F.3d 346, 353 (2d Cir. 2003), I concluded that placing a prisoner on lockdown for weeks for retaliatory purposes was sufficient to give rise to a constitutional retaliation claim. *See* Doc. #9 at 8 (citing *Manon v. Hall*, 2015 WL 8081945, at *8 (D. Conn. 2015)).

Construed liberally, Whipper's amended complaint states a plausible retaliation claim against Hannah and Erfe. In his amended complaint, Whipper alleges that Hannah had admitted to him that it was the intention of prison officials to continue punishing him because they believed he had fought with Snelgrove but were unable to prove it. Doc. #16 at 9 (¶ 55). He also alleges that based on Erfe's unusual role in investigating the supposed fight, as well as their "past history," Erfe had directed the prolonged placement in administrative segregation. *Ibid.* (¶ 53).

9

Although somewhat conclusory, I will permit the retaliation claim to proceed against Erfe and Hannah based on these new allegations.

The amended complaint does not, however, reveal a plausible retaliation claim against Rious or Quiros. Whipper claims that Rious retaliated against him by rejecting his second grievance against DOC staff as "duplicative" and "reactivat[ing]" his initial grievance, which shows a "fabricated narrative." *Id.* at 11–12 (¶¶ 67–74). He also alleges that Rious forced him to take a lower-paying job as a way of "compromising" his grievance, but does not allege that Rious placed him into the lower-paying job as a form of retaliation in its own right. *Id.* at 10–11 (¶¶ 64–66), 17–18 (¶¶ 107–09). Whipper alleges that Quiros rejected his appeals from the grievances as an act of retaliation and improperly labeled him as a "threat to safety and security." *Id.* at 12–13 (¶¶ 75–79).

These allegations are insufficient to show a constitutional deprivation. The Second Circuit has suggested that it is "questionable whether an adjudicator's rejection of an administrative grievance would make him liable for the conduct complained of." *McKenna v. Wright*, 386 F.3d 432, 437 (2d Cir. 2004).[1] District courts within the Circuit have generally found defendants not to be personally involved in a constitutional deprivation for the mere rejection of a grievance, but have found personal involvement when an official capable of

---

[1] In *Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir. 1995), the Second Circuit listed five ways in which a supervisory defendant may be deemed personally involved in a constitutional violation to, including, among others, if "the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong," or if "the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring." *Id.* at 873. The *Colon* decision, however, pre-dates the above-quoted statement from the Second Circuit's *McKenna* decision in 2004, which states that it is "questionable whether an adjudicator's rejection of an administrative grievance would make him liable for the conduct complained of." 386 F.3d at 437. More recently still, the Second Circuit has expressly reserved deciding whether the above-quoted aspects of *Colon* are still good law in light of the Supreme Court's intervening decision in *Iqbal*, which "may have heightened the requirements for showing a supervisor's personal involvement with respect to certain constitutional violations." *Grullon v. City of New Haven*, 720 F.3d 133, 139 (2d Cir. 2013).

resolving an ongoing violation reviews and responds to a grievance. *See Young v. Choinski*, 15 F. Supp. 3d 172, 191–92 (D. Conn. 2014) (collecting cases). Whipper's time in restrictive housing ended on December 30, 2016. Doc. #16 at 8 (¶ 52). He only filed his first grievance on January 10, 2017, at which point the alleged unconstitutional retaliation had ceased. *See id.* at 9 (¶ 56). Based on the facts of the amended complaint, both Rious and Quiros would have been unable to remedy the retaliatory conduct through a grievance, thus casting serious doubt on whether either of them could have been personally involved in the retaliation against Whipper.

Moreover, because the law is not clearly established on this point, both Rious and Quiros are entitled to qualified immunity from any suit for money damages arising from their alleged conduct. *See Poe v. Leonard*, 282 F.3d 123, 134 (2d Cir. 2002) (qualified immunity requires showing that official violated clearly established law and noting that, in the supervisory liability context, a court's focus must be on whether the law was clearly established both as to the underlying constitutional violation as well as the supervisory liability doctrine by which the supervisor would be held liable). Because Rious is sued only for damages, *see* Doc. #16 at 20 (¶ A, C), I will dismiss all claims against her, as well as all claims for damages against Quiros.

Whipper also sues Quiros for injunctive relief. *Ibid.* But a request for injunctive relief from a state official is not cognizable consistent with the Eleventh Amendment absent an allegation of an ongoing constitutional violation. *See, e.g.*, *Va. Office for Prot. & Advocacy v. Stewart*, 563 U.S. 247, 254 (2011) (citing *Ex parte Young*, 209 U.S. 123 (1908)). Whipper largely accuses Quiros of past actions, with the only allegation that could possibly constitute present conduct being Quiros' alleged labeling of Whipper as "a threat to safety and security." Doc. #16 at 13–14 (¶ 80). Whipper does not, however, allege any ongoing harm from this label

that could give rise to injunctive relief on a claim of retaliation. I will accordingly dismiss the remaining claim for injunctive relief against Quiros.

*Fourteenth Amendment Due Process*

Whipper claims that his prolonged placement in segregation also violated his Fourteenth Amendment right to due process. Doc. #16 at 15–20 (¶¶ 92–120). Although I agree that the prolonged placement in segregation after the dismissal of the disciplinary charge may state a plausible constitutional claim under the First or Fifth Amendment, I do not agree that Whipper has stated a plausible due process claim.

The standard analysis for a claim of a violation of procedural due process "proceeds in two steps: [A court] first ask[s] whether there exists a liberty or property interest of which a person has been deprived, and if so . . . whether the procedures followed by the State were constitutionally sufficient." *Swarthout v. Cooke*, 562 U.S. 216, 219 (2011) (*per curiam*).

In the prison context, which involves someone whose liberty interests have already been severely restricted because of his confinement in a prison, a prisoner plaintiff must show that he was subject to an "atypical and significant hardship . . . in relation to the ordinary incidents of prison life." *Sandin v. Conner*, 515 U.S. 472, 484 (1995). In *Sandin*, the Supreme Court concluded that a prisoner who was subject to a disciplinary term of 30 days confinement in restrictive housing did not sustain a deprivation of a liberty interest that was subject to protection under the Due Process Clause. *Id.* at 486. Following *Sandin*, the Second Circuit has explained that courts must examine the actual punishment received, as well as the conditions and duration of the punishment. *See Davis v. Barrett*, 576 F.3d 129, 133–34 (2d Cir. 2009); *Palmer v. Richards*, 364 F.3d 60, 64 (2d Cir. 2004).

Whipper alleges that he was confined in administrative segregation for 39 days, which also cost him a semester from school and wages from his job. For initial pleading purposes, I will assume that 39 days of segregation, in addition to time in school and wages, are sufficient to give rise to at least a plausible claim of a deprivation of a liberty interest.

But even having alleged a deprivation of a liberty interest, Whipper must further allege that he did not receive the process that he was constitutionally due. The procedural protections that are due to a prison inmate facing a disciplinary hearing are not as expansive as the due process protections for a criminal defendant standing trial. *See Wolff v. McDonnell*, 418 U.S. 539, 556 (1973); *Sira v. Morton*, 380 F.3d 57, 69 (2d Cir. 2004). Thus, for example, a prison inmate does not have the right to counsel or to confront witnesses against him. *See Sira*, 380 F.3d at 69 (citing *Wolff*, 418 U.S. at 567–70). On the other hand, an inmate must be given "advance written notice of the charges against him; a hearing affording him a reasonable opportunity to call witnesses and present documentary evidence; a fair and impartial hearing officer; and a written statement of the disposition, including the evidence relied upon and the reasons for the disciplinary actions taken." *Ibid.* (citing *Wolff*, 418 U.S. at 563–67). Moreover, there must be at least some evidence to support the findings made in the disciplinary hearing. *See Washington v. Gonyea*, 538 F. App'x 23, 25 (2d Cir. 2013).

Whipper does not allege that he was at any point denied the process due to him during the time the disciplinary charge was investigated. He received written notice of the charge, and when the charge ultimately terminated in his favor, he also received a summary report stating why it had been dismissed. At the same time, he does not allege any other deprivations of the well-

13

established elements of process that a prisoner does have. Thus, he has not stated a plausible claim for relief from a procedural due process violation.

To the extent Whipper is attempting to show a violation of substantive due process under the Fourteenth Amendment, his claim still fails. It is well-established that, "[w]here a particular Amendment 'provides an explicit textual source of constitutional protection' against a particular sort of government behavior, 'that Amendment, not the more generalized notion of substantive due process, must be the guide for analyzing [the] claim[].'" *Albright v. Oliver*, 510 U.S. 266, 273 (1994) (plurality opinion) (quoting *Graham v. Connor*, 490 U.S. 386, 395 (1989)). I have already ruled that Whipper's prolonged confinement in administrative segregation implicates his First Amendment right to free speech and his Fifth Amendment privilege against self-incrimination. *See* Doc. #9 at 8. Therefore, any Fourteenth Amendment substantive due process claim based on the same allegations would be duplicative. As such, Whipper has not stated any plausible due process claim, and the claim is hereby dismissed.

### *Injunctive Relief & Sovereign Immunity*

In addition to damages, Whipper requests injunctive relief in the form of an order against "Erfe, Quiros, and Hannah to stop the acts of retaliation against [him]." Doc. #16 at 20 (¶ C). I have already dismissed the claim against Quiros as unwarranted because it only concerns past conduct. *See supra* at 11–12. Similarly, Whipper can only obtain injunctive relief against Erfe and Hannah to protect him from an ongoing constitutional violation. Whipper's only plausible claim is for the retaliation he experienced during his 39 days of segregation. He has since been released and does not allege any other ongoing unconstitutional conduct. Thus, I will dismiss his remaining claims for injunctive relief against Erfe and Hannah.

14

Whipper's amended complaint leaves it ambiguous whether he means to seek monetary damages from Erfe, Quiros, or Hannah in their official capacities. However, to the extent he does mean to do so, his claim is plainly barred by the Eleventh Amendment and accordingly dismissed. *See Kentucky v. Graham*, 473 U.S. 159, 169 (1985). Thus, I will dismiss all claims against Erfe, Quiros, and Hannah in their official capacities.

## CONCLUSION

In accordance with the foregoing analysis, I enter the following orders:

(1) All claims against Rious and Quiros remain dismissed. The Clerk is directed to terminate Rious and Quiros as defendants to this action. Whipper's claims for retaliation may proceed against Watson, Verdura, Wright, Erfe, and Hannah in their individual capacities for damages. The Fourteenth Amendment claims and the request for injunctive relief are dismissed.

(2) The Clerk shall verify the current work addresses for Erfe and Hannah with the Department of Correction's Office of Legal Affairs, mail a waiver of service of process request packet containing the amended complaint (Doc. #16) to both defendants at the confirmed addresses within **twenty-one (21) days** of this Order, and report to the court on the status of the waiver request on the **thirty-fifth (35) day after mailing**. If Erfe or Hannah fails to return the waiver request, the clerk shall make arrangements for in-person service by the U.S. Marshals Service on him/her, and he/she shall be required to pay the costs of such service in accordance with Federal Rule of Civil Procedure 4(d).

(3) All defendants shall file their response to the amended complaint, either an answer or motion to dismiss, within **sixty (60) days** from the date the notice of lawsuit and waiver of service of summons forms are mailed to Erfe and Hannah. If they choose to file an

answer, they shall admit or deny the allegations and respond to the cognizable claims recited above. They may also include any and all additional defenses permitted by the Federal Rules.

(4) Discovery, pursuant to Federal Rules of Civil Procedure 26–37, shall be completed by **April 28, 2019**. Discovery requests need not be filed with the court.

(5) All motions for summary judgment shall be filed by **May 28, 2019**.

(6) Pursuant to Local Civil Rule 7(a), a nonmoving party must respond to a dispositive motion within **twenty-one (21) days** of the date the motion was filed. If no response is filed, or the response is not timely, the dispositive motion can be granted absent objection.

(7) If Whipper changes his address at any time during the litigation of this case, Local Court Rule 83.1(c)2 provides that he MUST notify the court. Failure to do so can result in the dismissal of the case. Whipper must give notice of a new address even if he is incarcerated. Whipper should write "PLEASE NOTE MY NEW ADDRESS" on the notice. It is not enough to just put the new address on a letter without indicating that it is a new address. If Whipper has more than one pending case, he should indicate all of the case numbers in the notification of change of address. Whipper should also notify defendants or defense counsel of his new address.

It is so ordered.

Dated at New Haven this 30th day of October, 2018.

/s/*Jeffrey Alker Meyer*
Jeffrey Alker Meyer
United States District Judge